# EXHIBIT I

*New — 09/01/08*

## CONTRACT PHARMACY AGREEMENT

**THIS CONTRACT PHARMACY AGREEMENT** ("**Agreement**") is made and entered into this *1st* day of *July*____, 2008 (the "**Effective Date**"), by and between Factor Health Management, LLC. a Delaware limited liability corporation ("**FHM**"), and Pharmacy Matters, Pharmacy (Iowa City) and (North Liberty), Iowa Companies ("**Contractor**").

### Background

A.     FHM and its affiliates are engaged in the sale, distribution and marketing of blood-clotting outpatient drugs used in the treatment of hemophilia ("**Factor Products**") and related services, and Contractor is a pharmacy duly-licensed in the State of Iowa; and

B.     FHM desires to engage Contractor to provide dispensing and related services on behalf of FHM's customers who reside in the State(s) of Iowa, and Contractor desires to provide such services, in accordance with the terms and conditions of this Agreement. Whenever any Customer or Customers are designated in this Agreement as being the Customer(s) of FHM in any manner, it is understood and agreed between the parties that they are so designated solely because FHM is the source of referral of the Customer to Contractor, and for no other reason. These Customers will continue to be customers of FHM for certain purposes set forth in the Contract, but will also become Customers of Contractor once Contractor dispenses Factor Products to those Customers.

**NOW, THEREFORE,** for and in consideration of the mutual covenants and agreements contained herein and other good and valid consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto covenant and agree as follows:

1.     **Engagement**. Upon the terms and conditions of this Agreement, FHM hereby engages Contractor on an independent contractor basis, and Contractor hereby accepts such engagement, to provide the Contract Pharmacy Services described in this Agreement.

2.     **Obligations of Contractor**.  Contractor agrees to provide the following "**Contract Pharmacy Services**":

2.1     **Distribution**. Contractor hereby agrees to be a nonexclusive distributor of Factor Products for FHM.  In such capacity, Contractor shall purchase Factor Products from FHM and label and resell the Factor Products to FHM's customers.  Contractor shall not sell or distribute any of the Factor Products other than in accordance with their intended use.  The parties acknowledge that nothing contained in this Agreement shall be construed as prohibiting (i) Contractor from purchasing, selling or marketing products competitive with the Factor Products or (ii) FHM from retaining other distributors for the Factor Products or selling or marketing Factor Products directly to its customers.  Contractor shall be solely responsible for confirming, dispensing and labeling all Factor Products sold to customers.  Contractor shall fill prescriptions pursuant to this Agreement with equal priority to Contractor's other prescriptions and diligently, promptly and professional sell and deliver the Factor Products that is purchases from FHM, entirely at its own expense and in accordance with a customer's prescription and applicable law.

C1101/12405990.1

2.2     <u>Product Orders</u>. Contractor shall order Factor Products exclusively through the submission to FHM of written purchase orders in such form as the parties may from time to time agree. FHM may refuse to accept any purchase order for any reason. FHM may also receive purchase orders directly from customers. In the event that FHM receives an order for Factor Products from a customer pursuant to a physician's prescription, FHM may, at its option, send such Factor Products to Contractor for labeling and dispensing to customers.

2.3     <u>Marketing</u>. During the term of this Agreement, Contractor may identify itself as an "Authorized Distributor" of FHM. Contractor shall use only sales, marketing and promotional material, if any, supplied by FHM with respect to the Factor Products and shall use such materials only in the manner directed by FHM and in compliance with applicable law.

2.4     <u>Pharmacy License</u>. Contractor hereby represents and warrants that at all times during the term of this Agreement, Contractor shall hold a valid and unrestricted pharmacy license in the State of Iowa.

2.5     <u>Availability</u>. Contractor shall have a licensed pharmacist, authorized to dispense the Factor Products and all other pharmaceuticals, on-call twenty-four hours a day, seven days a week, three hundred and sixty-five days a year, to respond to emergency calls from either customers or FHM.

2.6     <u>Standards</u>. Contractor shall provide the Contract Pharmacy Services in accordance with all applicable federal and state laws, regulations, and rules governing the Contract Pharmacy Services.

2.7     <u>Records</u>. Contractor shall maintain timely, accurate and complete records of all Contract Pharmacy Services in accordance all applicable federal and state laws and regulations. FHM shall have access to such records, and supporting documents as permitted by applicable federal and state laws and regulations.

2.8     <u>Contractor Representations</u>. Contractor certifies that its ability to provide professional services in any state, commonwealth or other jurisdiction has never been revoked, limited, suspended or otherwise restricted in any manner. Contractor further certifies that it is not currently and has never been suspended from participation in or subjected to any type of criminal or civil sanction, fine, civil money penalty, debarment or other penalty by any private or public health insurance program, including Medicare, Medicaid, Tricare or any other federal or state health insurance program. Both FHM and Contractor do hereby warrant and guarantee that none of their respective personnel providing services pursuant to this Agreement are presently excluded from participation in any Medicare or Medicaid Program, nor are any of their respective principals, employees, officers or directors presently nor ever have been excluded from participation in any Medicare or Medicaid Program, and that FHM and Contractor are not excluded from participation in any Medicare or Medicaid program. Further, each party does hereby fully hold harmless and indemnify the other from any and all claims and losses it might sustain, including all fines, penalties and attorneys' fees, if the party or any of the party's personnel herein named have been excluded from any of such programs and said exclusion was known at the date of execution of this agreement to either Party and not disclosed herein, or are

2

W-2133

excluded during the term of this Agreement, and such exclusion is not disclosed within five (5) days of receipt of notice of exclusion by a Party, and said exclusion and failure to notify causes any kind of a claim to be made against the other Party.

3.   **Obligations of FHM.**

3.1   **Product Orders.** Upon receipt of an approved Factor Product purchase order in accordance with **Section 2.2**, FHM shall ship Factor Products ordered by Contractor FOB Contractor and Contractor shall ship factor Products FOB the customer's address.

3.2   **Billing and Collection.** FHM shall prequalify, verify benefits, and eligibility for all customers in advance as to medical necessity, payer source, physician orders, and any other pertinent factors to insure customer or third party payment for the Factor Products to be ordered. After verification and pre-authorization of customers orders (when pre-authorization is required by payer) by FHM, Contractor shall use commercially reasonable efforts to bill and collect from customers and/or applicable third party payers for the Factor Products dispensed by Contractor. All billing and collections remittances to FHM of payments shall be at the actual collected reimbursement rate received by Contractor. FHM shall have the right to request review and approval of all claims submitted by Contractor prior to the submission of said claims for payment. Contractor shall not be responsible for payment to FHM for Factor Products in the event that a customer or their third party payer denies prior approval adjudication or if prior approval is withdrawn after the product has been dispensed for claims prequalified by FHM.. In the event that contractor prequalifies and/or electronically transmits claim, contractor will remain responsible for payment to FHM if prior authorization is withdrawn after product is dispensed. If the product has not been dispensed Contractor shall immediately return the product via overnight delivery to FHM. Contractor shall remit to FHM all amounts received from, or on behalf of, FHM customers upon the earlier of cleared funds from payer, or within five (5) days of receipt. Contractor shall make available to FHM and its agents during regular business hours, access to the financial records of Contractor and its agents to the extent that such records relate to this Agreement, to enable FHM to audit or review Contractor's payment receipts for the Factor Products ("Audit"). If the Audit reveals discrepancies which resulted in underpayments to FHM of five percent (5%) or more, Contractor shall pay the reasonable cost of such Audit. Any underpayment shall immediately be paid by Contractor to FHM.

**3.3   Compensation.** In consideration of the provision of Contract Pharmacy Services, FHM shall pay Contractor, and Contractor shall accept as payment in full from FHM, a Factor Product dispensing fee of one and ½ percent (1.5 %) of the reimbursement received from the applicable third-party payor or seventy five dollars ($75.00), whichever is greater, for each Factor Product prescription filled and dispensed by Contractor under this Agreement.
This fee shall be fixed for a period of at least one year, and may adjusted no more frequently than annually. Any adjustments to this fee may be made solely on a prospective basis.

3

W-2134

**4.** **Term.** Unless earlier terminated pursuant to **Section 5**, this Agreement shall commence on the Effective Date and continue in effect for an initial term of one year. Thereafter, this Agreement shall automatically renew for additional terms of one year each until termination pursuant to **Section 5**.

**5.** **Termination.**

5.1 Termination With or Without Cause. Either party may terminate this Agreement at any time, with or without cause, upon thirty (30) days' prior written notice to the other party.

5.2 Immediate Termination. FHM may terminate this Agreement immediately upon written notice to Contractor upon the occurrence of any of the following events: (i) loss, limitation or suspension of Contractor's pharmacy license in the State(s) of Iowa (ii) loss, limitation or suspension of Contractor's pharmacist-in-charge pharmacist license in the State of Iowa, (iii) revocation, suspension or restriction of Contractor's status as a participating provider in the programs of any payor or Contractor's inability to become a participating provider with any payor; (iv) exclusion from participation in any federal health care insurance program, including, Medicare, Medicaid, and Tricare; (v) Contractor's failure to maintain professional liability insurance coverage; (vi) Contractor's general assignment for the benefit of creditors, failure to pay when due any indebtedness, petition for relief in bankruptcy or similar laws for the protection of debtors, the initiation of such proceedings against Contractor, or upon notice of a finding that Contractor is insolvent under applicable law; or (vii) the conviction of Contractor or any principal, officer, director, manager or shareholder of Contractor that may adversely affect the reputation of Contractor, in FHM's sole opinion. Contractor will immediately notify FHM in writing upon the occurrence of any of the events described in this **Section 5.2**.

5.3 Modification or Termination Upon Advice of Counsel. If at any time either party reasonably believes in good faith based upon the advice of reputable health care counsel that this Agreement or the performance by that party of any of its obligations under this Agreement violates any material law or regulation, state or federal, presents a substantial risk of the loss or restriction of that party's license, tax exemption, or right to participate in Medicare, Medicaid, or any other governmental program, or presents a substantial risk of causing debt issued by that party that was tax-exempt when originally issued to become subject to federal or state income tax, then that party may, upon written notice, require the other party to enter into good faith negotiations to renegotiate the terms of this Agreement, in a manner that attempts to retain as much as possible of the economic arrangements originally contemplated by the parties without violating any applicable legal, tax, or reimbursement requirements. If the parties are unable to reach an agreement concerning the modification of this Agreement within 60 days after the date of the notice seeking renegotiation (or sooner if required by law), then either party may immediately terminate this Agreement by written notice to the other party. The rights of the parties under this Section are in addition to any other termination rights the parties may have under this Agreement.

5.4 Effect of Termination. Upon termination of this Agreement, neither party shall have any further rights or obligations under this Agreement, provided, however, (i) that

4

W-2135

Contractor shall immediately return to FHM, at Contractor's sole expense, all Factor Products in Contractor's possession that, for any reason, have not been sold to customers and that have not been paid for by Contractor; (ii) that Contractor shall continue to remit to FHM, within five (5) days of receipt, all monies received by Contractor from customers or third-party payors for Contract Pharmacy Services rendered by Contractor hereunder prior to the termination date; and (iii) that **Section 2.7** (Records), **Section 6** (Insurance), **Section** 7 (Security Interest), **Section 10** (Confidentiality), **Section 12** (Indemnification) and **Section 13** (Non-Competition; Non-Solicitation) shall survive termination of this Agreement.

**6.     Insurance.**  At all times during the term of this Agreement, Contractor will maintain, at its sole expense, (i) comprehensive, general liability insurance, (ii) and (iii) professional liability insurance.  Such polices shall be underwritten by a reputable, licensed insurance company in the minimum amount of $1,000,000 combined single limit coverage in connection with Factor Products and Contract Pharmacy Services provided under this Agreement.  Contractor agrees to provide FHM with evidence of such insurance coverage as described above prior to the Effective Date of this Agreement.  Contractor will promptly notify FHM in the event such insurance coverage is canceled or otherwise not renewed for any reason.  Notwithstanding anything to the contrary herein, if Contractor's coverage is on a claims made basis, upon termination of the Agreement for any reason whatsoever, Contractor agrees to purchase an extended reporting endorsement (*i.e.*, tail coverage) covering the period of Contractor's engagement by FHM hereunder.  Contractor agrees that it shall furnish evidence of such tail coverage to FHM upon request.

**7.     Security Interest.**  To secure all obligations of Contractor hereunder, Contractor hereby grants to FHM a security interest in (a) all present and future accounts, contract rights, rights to payment and general intangibles arising out of the sale of inventory and other goods furnished, supplied, sold or delivered by FHM to Contractor, which shall include, but not be limited to, the Factor Products, or arising from the sale or resale of such items to any customer, patient or other account debtor of Contractor or the rendering or provision of any services by FHM to Contractor or to any customer, patient or account debtor of Contractor, and all rights related to or arising therefrom, including, without limitation, all accounts and contract rights, rights to payment and all general intangibles owing to Contractor, by any health care provider, insurance company, state or federal agency or any other third party or person making payment for or on behalf of any such customer, patient or account debtor, or the proceeds of any of the foregoing.  FHM shall have all rights of a secured party under the Uniform Commercial Code.  Contractor consents to the filing of a UCC-1 financing statement with the appropriate governmental agencies, and agrees to sign and deliver such modifications and similar documents as may be reasonably required by FHM from time to time.

**8.     Warranties and Disclaimers.**  FHM MAKES NO WARRANTIES, WHETHER WRITTEN, ORAL, EXPRESS OR IMPLIED, WITH RESPECT TO THE PRODUCTS. EXCEPT TO THE EXTENT PROHIBITED BY LAW, FHM HEREBY EXPRESSLY DISCLAIMS ANY AND ALL IMPLIED WARRANTIES, INCLUDING THE WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

5

W-2136

**9.  Trade Names and Trademarks.** Contractor shall not use the word "Factor Health Management" or any trade name or trademark used or claimed by FHM or any of its affiliates, except in connection with the advertising and sales of the Factor Products in accordance with this Agreement and any policies of FHM regarding the use of trade names or trademarks.  Contractor acknowledges that, except as expressly provided herein, (i) it has no rights or interest of any kind in or to any trade name or trademark used by FHM and (ii) it will not assert any rights or interest in any such trade name, trademark or other proprietary data or information of FHM by virtue of the rights granted to Contractor under this Agreement.

**10.  Confidentiality.** Each party agrees to keep confidential and not to use or to disclose to others, during the term of this Agreement or any time thereafter, except as expressly consented to by the other party, as required by this Agreement, or as required by law, the other party's Confidential Information or any other matter or thing learned or acquired by a party through its association with the other party that is not otherwise available to the public.  "**Confidential Information**" shall mean proprietary information of each party concerning its business affairs, property, methods of operation, computer system or network (including, without limitation, data files and software encompassed within a system or network), financial data, patient information or other confidential information.  Confidential Information (other than patient information) shall not be considered Confidential Information if it: (i) is publicly known prior to or after disclosure hereunder other than through acts or omissions attributable to the other party's employees or representatives; (ii) as demonstrated by prior written records, is already known to the other party at the time of disclosure hereunder; (iii) is disclosed in good faith to the other party by a third party having a lawful right to do so; (iv) is the subject of written consent or authorization of the party which supplied such information authorizing disclosure; or (v) was independently developed by the other party without reference to the Confidential Information.  In the event of a disclosure of Confidential Information required by law, each party will provide the other party with at least 2 business days' written notice prior to any such disclosure.  The parties acknowledge that the provisions of this Section are of particular importance for the protection and promotion of the parties' existing and future interests, and that in the event of any breach of this Section, a claim for monetary damages may not constitute an adequate remedy.  The parties therefore agree that in the event of a breach or threatened breach of this Section, the nonbreaching party may apply to any court of competent jurisdiction for injunctive or other relief, and the breaching party will not object to the form of the action or to the form of relief sought in any such action.

**11.  HIPAA.** The parties acknowledge that with regard to the billing and collection services provided by FHM on behalf of Contractor, FHM is a business associate of Contractor as such term is defined under the Health Insurance Portability and Accountability Act of 1996 and the regulations promulgated thereunder ("**HIPAA**").  Attached hereto and incorporated herein at **Exhibit A** is a business associate agreement that the parties are simultaneously entering into.

**12.  No Referrals.** No payment under this Agreement is in return for the referral of patients, if any, or in return for purchasing, leasing or ordering services from FHM.  It is not a purpose of this Agreement, and no part hereof shall be so construed, to induce or encourage the referral of patients.  The parties acknowledge and agree that: (1) there is no requirement either expressed or implied, under this Agreement or any other agreement between FHM  and Contractor that any

6

W-2137

patients be referred to Contractor, FHM for services (*e.g.*, while Contractor will purchase services and supplies hereunder from FHM, no pricing or amount is intended to induce referrals or governmental or other patients by Contractor to FHM or vice versa); and (2) that the compensation set forth in this Agreement is consistent with fair market value in arms-length transactions and is not determined in a manner that takes into account the volume or value of any referrals or business otherwise generated between FHM and Contractor.

**13.** **Indemnification.** Each party agrees to indemnify, defend and hold harmless, to the fullest extent allowed by law, the other party and its affiliates, and their officers, directors, members, managers, shareholders and employees, from and against any and all claims, damages, losses, and expenses (including attorneys' fees and costs) arising out of or resulting from such party's negligent acts or omissions arising out of this Agreement or the failure to comply with and/or carry out its duties and responsibilities under this Agreement.

**14.** **Non-competition; Non-solicitation.** During the term of this Agreement and for a period of two (2) years following the termination of this Agreement for any reason, Contractor agrees that it and its officers, directors, principals, shareholders, managers and key employees (*e.g.*, pharmacist-in-charge) ("**Principals**") shall not directly or indirectly, alone or in association with others, in a capacity as partner, shareholder or other legal or beneficial capacity, or otherwise, or through or in connection with any corporation, partnership, limited liability company or other form of business entity, without the prior written consent of FHM: (i) dispense any products which are similar to the Factor Products to any Customer of FHM; (ii) solicit any Customer for purposes of selling to such customers products which are similar to Factor Products; (iii) divert or attempt to divert, for his, her or its direct or indirect benefit or for the direct or indirect benefit of any other person, any Customer of FHM, or any of the business or patronage of any Customer of FHM; (iv) influence or attempt to influence any Customer of FHM to transfer such Customer's business or patronage from FHM directly or indirectly to Contractor or to any other person, corporation, partnership, limited liability company, joint venture or sole proprietor; (v) employ or contract for services with any Employee or urge, induce, entice or in any manner whatsoever solicit any Employee to leave FHM's employment; or (vi) in any other manner interfere with, disrupt or attempt to disrupt the business relationships of FHM. For purposes of this **Section 13**, the term "**Customer**" shall mean and include any person that purchased Factor Products on the Effective Date or at any time during the preceding thirty-six (36) month period or any person who becomes a customer of FHM while this Agreement is in effect. For purposes of this **Section 13**, the term "**Employee**" shall mean and include any person who is or was an employee of FHM or one of its affiliates at any time during the term of this Agreement or during the thirty-six (36) months prior to the Effective Date. Contractor agrees to cause every key employee providing Services under this Agreement to sign a written agreement acknowledging that he or she is bound by the provisions of this **Section 13**. Contractor acknowledges and agrees that the restrictions set forth in this **Section 13** are necessary and important to protecting FHM's valuable and legitimate existing and future business interests in developing and maintaining customer relationships, that the restrictions set forth in this **Section 13** will not prevent Contractor and its Principals from earning a livelihood, and that in the event of any breach of this **Section 13**, a claim for monetary damages may not constitute an adequate remedy. Contractor therefore agrees that in the event of a breach or threatened breach of this **Section 13**, FHM may

7

W-2138

apply to any court of competent jurisdiction for injunctive or other relief, and Contractor will not object to the form of the action or to the form of relief sought in any such action. If this **Section 13**, or any part thereof, is held to be unenforceable because of the duration or scope of such provision, the parties agree that the court making such determinations will have the power to reduce the duration and/or scope of such provisions, and in its reduced form such provisions will then be enforceable and will be enforced.

15.     **Status of Contractor.** The parties acknowledge that Contractor is an independent contractor of FHM. In no event will Contractor or any agent or employee of Contractor be deemed a joint venturer, partner, employee, or agent of FHM by virtue of this Agreement. FHM has no control over the manner or method by which Contractor meets his, her or its obligations under this Agreement; provided that Contractor's services will be performed in a competent and efficient manner in accordance with current professional standards and applicable law. FHM will not withhold any sums for income tax, Social Security, unemployment insurance, or any other employee withholding, nor will FHM offer Contractor or any agent or employee of Contractor any employee benefits including, without limitation, pension benefits, worker's compensation coverage, and death and disability insurance. Contractor shall be solely responsible for all employment-related withholdings and benefits and shall hold FHM harmless from and against any claims or expenses, including attorneys' fees, resulting from any failure by Contractor to fulfill this responsibility. Unless specifically authorized to do so by this Agreement or by FHM in writing, Contractor is not authorized to enter into any contract on behalf of FHM or any of its affiliates or to render FHM or any of its affiliates liable for any purpose whatsoever.

16.     **Notices.** All notices, consents, waivers and other communications under this Agreement must be in writing and will be deemed to have been duly given when (i) delivered by hand (with written confirmation of receipt), (ii) sent by facsimile (with a printed confirmation of receipt), provided that a copy is mailed by U.S. First Class Mail, or (iii) when received by the addressee, if sent by a nationally-recognized overnight delivery service (receipt requested) in each case to the appropriate address and facsimile number set forth on the signature page hereof (or to such other addresses and facsimile numbers as a party may designate by notice to the other party).

17.     **Regulatory Compliance**. Until the expiration of four years after the furnishing of services under this Agreement, Contractor agrees to make available to the Secretary of Health and Human Services, the U.S. Comptroller General, and their representatives this contract and all books, documents, and records necessary to certify the nature and extent of the costs of those services. If Contractor carries out the duties of the contract through a subcontract worth $10,000 or more over a twelve-month period with a related organization, the subcontract will also contain an access clause to permit access by the Secretary, Comptroller General, and their representatives to the related organization's books and records.

18.     **Miscellaneous.** This Agreement will be governed by, and construed in accordance with, the internal laws of the State of Delaware without regard to principles of conflicts of law. No delay or omission by either party to exercise any right or remedy under this Agreement will be construed to be either acquiescence or the waiver of the ability to exercise any right or remedy in the future. Neither party will be liable or be deemed in default of this Agreement for any delay

CH01/ 12405990.1

W-2139

or failure to perform caused by Acts of God, war, disasters, strikes, or any similar cause beyond the control of either party. The headings of the various sections of this Agreement are inserted merely for convenience and do not expressly or by implication limit, define or extend the specific terms of the section so designated. For purposes of this Agreement, the word "shall" shall be construed to mean "must", and the word "may" shall be construed to mean "at one's option". In the event any part or parts of this Agreement are held to be unenforceable, the remainder of this Agreement will continue in effect. The rights and obligations of this Agreement may be assigned by FHM without Contractor's consent to any affiliate or successor of FHM. The rights and obligations of this Agreement may not be assigned or delegated by Contractor without the prior written consent of FHM. Any attempted assignment or assignments by Contractor in violation of this Section will not release Contractor from any liability to FHM or a third party that arises from the assignee's performance hereunder and, notwithstanding anything else in this Agreement, will entitle FHM to immediately terminate this Agreement. This Agreement may not be modified in any respect other than by a written instrument signed by both parties. This Agreement supersedes any previous contracts between the parties and constitutes the entire agreement between the parties. Both parties acknowledge that any statements or documents not specifically referenced and made a part of this Agreement will not have any effectiveness.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the Effective Date.

PHARMACY MATTERS, (IOWA CITY)          FACTOR HEALTH MANAGEMENT, LLC
and (NORTH LIBERTY)

By: _Michael F Stein_                   By: _Steven A. Schneider_

Name: _Michael E. Stein_                Name: _Steven A. Schneider_

Title: _President_                      Title: _CFO_

Address: _230 Scott Court_              Address: _____

Address: _Iowa City, IA 52245_          Address: _____

Facsimile: _319-337-2493_               Facsimile: _____

CH01/ 12405990.1

**EXHIBIT A**

**BUSINESS ASSOCIATE AGREEMENT**

CH01/ 12405990.1

W-2141

## BUSINESS ASSOCIATE AGREEMENT

This Business Associate Agreement ("Business Associate Agreement") is entered into and effective this 26ᵗʰ day of _____, 2008 ("Effective Date"), by and between FACTOR HEALTH MANAGEMENT, LLC, a Delaware limited liability company ("FHM"), FCS PHARMACY, LLC, a Florida limited liability company ("FCS"), and Pharmacy Matters, Inc., (the "Pharmacy").

1.   **Definitions.** For purposes of this Business Associate Agreement:

   1.1.   Capitalized terms used not defined herein shall have the meanings ascribed to them in HIPAA.

   1.2.   "**Agreement**" shall mean the Contract Pharmacy Agreement and Security Agreement entered into by and between the parties hereto and dated as of even date herewith.

   1.3.   "**HIPAA**" shall mean the Health Insurance Portability and Accountability Act of 1996 and the regulations promulgated thereunder, including, but not limited to, the Standards for Privacy of Individually Identifiable Health Information at 45 CFR Part 160 and Part 164, Subparts A and E (the "**Privacy Rule**") and the Security Standards for the Protection of Electronic Protected Health Information, 45 CFR Part 160 and Part 164, Subpart C (the "**Security Rule**").

   1.4.   "**Protected Health Information**" or "**PHI**" shall have the meaning set forth in HIPAA, limited to the PHI that Pharmacy receives from FHM and FCS.

2.   **Uses and Disclosures.** Pharmacy may make any and all uses and disclosures of PHI as reasonably necessary to perform their obligations under the Agreement, as otherwise permitted by this Business Associate Agreement or Required by Law. With regard to their use and disclosure of PHI, Pharmacy agrees as follows:

   2.1.   **Use and Disclosure.** Pharmacy shall not use or further disclose PHI except as permitted by this Agreement.

   2.2.   **Safeguards.** Pharmacy shall use safeguards that are appropriate and sufficient to prevent use or disclosure of PHI other than disclosures permitted or required by this Business Associate Agreement.

   2.3.   **Reporting.** Pharmacy shall report to FHM and FCS any unauthorized use or disclosure of PHI not permitted or required by this Business Associate Agreement of which they become aware.

   2.4.   **Mitigation.** Pharmacy shall, to the extent practicable, mitigate any harmful effect that is known to FHM or FCS of a use or disclosure of PHI by Pharmacy in violation of this Business Associate Agreement.

W-2142

2.5. **Agents and Subcontractors.** Pharmacy shall ensure that any agents and subcontractors to whom they provide PHI as permitted or required under this Business Associate Agreement agree to the same restrictions and conditions that apply to Pharmacy with respect to such PHI.

2.6. **Third Party Requests.** If Pharmacy receives any request from a third party with respect to PHI, including, without limitation, a request for access, amendment or an accounting, Pharmacy shall, within five (5) business days, forward such request to FHM and FCS. Following receipt of such notice, FHM and FCS shall be responsible for responding to such request. To assist FHM and FCS in handling such requests, Pharmacy shall at all times make any and all PHI in their possession available to FHM and FCS within five (5) business days of FHM or FCS's request.

2.7. **Audit.** Pharmacy shall make their internal practices, books, and records relating to the use and disclosure of PHI received from, or created or received by Pharmacy on behalf of, Pharmacy available to the Secretary of Health and Human Services, upon request, for purposes of determining and facilitating Pharmacy's compliance with HIPAA.

2.8. **Management and Administration.** Pharmacy may use PHI for their proper management and administration and to fulfill any legal responsibilities of Pharmacy. Pharmacy may also disclose PHI to a third party for the purpose of Pharmacy's proper management and administration or to fulfill any legal responsibilities of Pharmacy, provided that the disclosures are Required by Law or Pharmacy, as applicable, has received from the third party reasonable assurances that (i) the information will be held confidentially and used or further disclosed only as Required by Law or for the purpose for which it was disclosed to the third party; and (ii) the third party will notify Pharmacy, as applicable, of any instances of which it becomes aware in which the confidentiality of the information has been breached.

2.9. **Aggregation.** Pharmacy may aggregate the PHI in their possession, provided that the purpose of such aggregation is related to Pharmacy's Health Care Operations.

2.10. **Deidentification.** Pharmacy may de-identify any and all PHI and use and disclose for any purpose de-identified health information generated from PHI provided that the PHI is de-identified in accordance with the requirements of HIPAA.

3. **Term and Termination.**

3.1. **Term.** This Business Associate Agreement is effective as of the Effective Date and shall continue in full force and effect until terminated as provided herein.

3.2. **Automatic Termination.** This Business Associate Agreement shall automatically terminate upon the effective date of termination of the Agreement.

3.3. **Termination for Cause.** FHM or FCS may terminate this Business Associate

W-2143

Agreement in the event that Pharmacy breaches this Business Associate Agreement and does not, within thirty (30) days of written notice from FHM or FCS, cure such breach. The written notice shall set forth in reasonable detail the alleged breach.

3.4. **Termination for Change of Status.** FHM and FCS may terminate this Business Associate Agreement if facts, circumstances or law change in such a way as to cause Pharmacy no longer to be a Business Associate of FHM and FCS. If FHM and FCS terminate this Business Associate Agreement pursuant to this subsection, they shall give Pharmacy notice of termination that includes the reasons why they are no longer FHM and FCS's Business Associate.

3.5. **Duties Upon Termination.** Upon termination of this Business Associate Agreement, Pharmacy shall return to FHM and FCS, or, at FHM and FCS's written request, destroy, all PHI in their possession, and keep no copies thereof. In the event that return or destruction is not feasible, Pharmacy shall extend the protections of this Business Associate Agreement to the retained PHI and limit further uses and disclosures to the purposes that make the return or destruction infeasible. In such an event, the protections of this Business Associate Agreement shall survive termination of this Business Associate Agreement.

**Obligations of Pharmacy.** Pharmacy agrees that it:

4.1. Has included, and will include, in its Notice of Privacy Practices a statement that Pharmacy may disclose PHI for treatment and health care operations purposes.

4.2. Has obtained, and will obtain, from individuals such consents, authorizations and other permissions as are required by applicable laws (including without limitation, HIPAA).

4.3. Will promptly notify FHM and FCS in writing of any restrictions on the use and disclosure of PHI that Pharmacy has agreed to that may affect Pharmacy's ability to provide services or to perform their obligations under this Business Associate Agreement.

4.4. Will promptly notify FHM and FCS in writing of any change in, or revocation of, permission to use or disclose PHI, if such change or revocation may affect Pharmacy's ability to provide services or to perform their obligations under this Business Associate Agreement.

5. **Security Rule.** Effective on the date that compliance with the Security Rule is required, Pharmacy shall:

5.1. Implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity and availability of electronic PHI;

5.2. Ensure that any agent, including a subcontractor, to whom Pharmacy provides electronic PHI agrees to implement reasonable and appropriate safeguards to protect

electronic PHI; and

5.3    Report to FHM and FCS any Security Incident of which Pharmacy becomes aware.

6.    **Miscellaneous.**

6.1.    Interpretation. In the event of a conflict between the terms of this Business Associate Agreement and the terms of the Agreement, the terms of this Business Associate Agreement shall prevail.

6.2.    Counterparts. This Business Associate Agreement may be executed in two or more counterparts, each of which shall be an original, but all of which taken together shall constitute one and the same agreement.

6.3.    Amendment. The parties shall amend this Business Associate Agreement from time to time by mutual written agreement in order to keep this Business Associate Agreement consistent with any changes made to the HIPAA laws or regulations in effect as of the date of this Business Associate Agreement and with any new regulations promulgated under HIPAA. Any party may terminate the Business Associate Agreement in whole or in part if the parties are unable to agree to such changes by the compliance date for such new or revised HIPAA laws or regulations.

6.4    No Third Party Benefit. This Business Associate Agreement is for the sole benefit of the parties hereto and shall not confer or be deemed to confer any rights, benefits or claims upon any person or entity not a party to this Business Associate Agreement.

W-2145

  
**IN WITNESS WHEREOF**, PHM, FCS and Pharmacy have caused this Business Associate Agreement to be signed and delivered by their duly authorized officers as of the Effective Date.

**PHARMACY MATTERS**

By: _____

Its: _____

**FCS Pharmacy, LLC**

By: _____

Its: _____

**Factor Health Management, LLC**

By: _____

Its: _____

# SECURITY AGREEMENT

Pharmacy Matters Pharmacies, whose address are (Iowa City) 230 Scott Court, Suite 238, Iowa City, IA 52245, (North Liberty) 1765 Linger Lane, Suite 238, North Liberty, IA 52317 hereinafter referred to as the "Pharmacy", and Factor Health Management, LLC, a Delaware limited liability company, whose address is 7700 Congress Avenue – Suite 3109, Boca Raton, Florida 33487, hereinafter referred to as the "Secured Party", do hereby agree this ___ | ___ day of July, 2008, as follows:

1. **Security Interest.** The Pharmacy hereby grants to Secured Party a continuing and unconditional security interest (the "Security Interest") in the following collateral (the "Collateral"):

   Accounts receivable of the Pharmacy for amounts due to the Pharmacy from third-party insurers and payors for Factor Product and Non-Factor Medication dispensed to Members by the Pharmacy pursuant to the Contract Pharmacy Agreement ("Contract Pharmacy Agreement") of this same date between the Pharmacy and the Secured Party.

2. **Indebtedness Secured.** This Agreement and the Security Interest shall secure the payment moneys due to the Secured Party from time to time under invoices for Expected Reimbursement Amount submitted to the Pharmacy by the Secured Party in accordance with the Contract Pharmacy Agreement (the "Indebtedness").

3. **Warranties of the Pharmacy.** The Pharmacy warrants, and so long as this Agreement remains in force, shall be deemed continuously to warrant as follows:

   a. there are no liens or encumbrances which could attach to the Collateral, except for the security interest created hereby;

   b. the Pharmacy has full power and authority to enter into this Agreement and any person signing it on behalf of debtor does so with the Pharmacy's full authority; and

   c. the information which the Pharmacy has supplied or hereafter supplies to the Secured Party is true and correct.

4. **Covenants of the Pharmacy.** For so long as this Agreement is in force, and the Indebtedness remains unpaid, the Pharmacy does covenant with the Secured Party as follows:

   a. the Pharmacy will defend Collateral against the claims of all other persons;

   b. the Pharmacy will keep the Collateral free from all other liens and encumbrances;

   c. the Pharmacy will not sell, transfer, lease or otherwise dispose of the Collateral or any interest therein;

   d. the Pharmacy will execute and deliver to the Secured Party any financing statements or other documents reasonably requested by Secured Party if Debtor the Pharmacy defaults on payments when due;

   e. the Pharmacy will pay all federal, state, and local taxes, and other charges of every nature which may be levied or assessed against the Collateral or imposed on the business operated pursuant to the Collateral, before any interest or penalties accrue;

W-2147

f.    the Pharmacy will do all things necessary to maintain this Security Agreement; and

g.    the Pharmacy will pay its obligations to Secured Party promptly when due. In the event of default, the Pharmacy will also repay to Secured Party immediately and without demand, all expenses incurred by Secured Party, including reasonable attorney's fees and legal expenses, which the Secured Party incurs under this Agreement, together with interest at the highest legal rate from the date of expenditure.

5.    <u>Default</u>. Any of the following shall constitute an event of default ("Default"):

a.    the failure to pay when due any of the amounts invoiced to the Pharmacy by the Secured Party pursuant to the Contract Pharmacy Agreement, time being of the essence of this Agreement and the Contract Pharmacy Agreement;

b.    the failure to perform any obligation of the Pharmacy under this Agreement or the Contract Pharmacy Agreement;

c.    the filing by or against the Pharmacy of a petition in bankruptcy; or

d.    any attachment or levy against the Collateral or any other occurrence which inhibits the Secured Party's free access to the Collateral or jeopardizes the Secured Party's interest in the Collateral.

6.    <u>Rights of Secured Party</u>. The nature of the Collateral is such that delays in asserting the rights of the Secured Party in the event of Default may seriously impair the value of the Collateral. Therefore, to the maximum extent permitted by law, as may be liberally construed, the Pharmacy does hereby grant to Secured Party the following rights:

a.    Secured Party may file any financing statement or other document relating to the Collateral which the Secured Party deems appropriate, without the Pharmacy's signature thereon;

b.    the Pharmacy hereby appoints the Secured Party as the Pharmacy's attorney-in-fact to execute such documents and to perform all other acts which the Secured Party deems appropriate to perfect and to continue perfection of the Security Interest and to do any act which the Pharmacy is obligated to do under this Agreement and to exercise rights under this Agreement which the Pharmacy is entitled to exercise;

c.    upon any Default, the Secured Party may (but shall not be obligated to) perform any duty of the Pharmacy hereunder, and the Pharmacy shall immediately reimburse the Secured Party upon demand for any expenses incurred by the Secured Party thereby;

d.    upon the happening of any Default, the Secured Party's rights with respect to the Collateral shall be those of a Secured Party under the Uniform Commercial Code and/or any other applicable laws of the United States or the State of Florida; and,

e.    as permitted by law, the Secured Party may assign any or all of its rights or interests under the Contract Pharmacy Agreement or this Agreement.

7.    <u>Notice</u>. Any notice hereunder shall be sufficient if mailed by regular or certified mail or hand-delivered to the Pharmacy or the Secured Party at either of the addresses set forth above.

W-2148

8. <u>Costs</u>. The Pharmacy shall pay all costs and expenses incurred by Secured Party in enforcing this Agreement, including (but not limited to) reasonable attorney fees, whether suit is brought or not and whether incurred in connection with collection, trial, appeal or otherwise.

9. <u>Waiver of Notice and Hearing</u>. The Pharmacy hereby waives any rights the Pharmacy may have to notice and a hearing or the requirement of a bond before repossession of Collateral is sought by the Secured Party whether by self-help, replevin, attachment, foreclosure, or otherwise.

10. <u>Miscellaneous Provisions</u>:

    a. No delay or omission by the Secured Party in exercising any right hereunder shall operate as a waiver of that or any other right.

    b. The terms "Secured Party" and "Pharmacy" as used in this Agreement shall include the personal representatives, and successors or assigns (if permitted) of those parties.

    c. This Agreement may not be modified or amended except in writing, signed by the Pharmacy and by the Secured Party.

    d. This Agreement shall be construed under the laws of the State of Florida. Venue for the enforcement of the Agreement shall be in Palm Beach County, Florida.

    e. This Security Agreement is a continuing Agreement which shall remain in force until the Secured Party shall have been paid in full, with interest, for all amounts due from the Pharmacy.

    f. No party to this Agreement shall be discharged by any extension of time, the taking of further security, releasing security, extinguishment of the security interest as to all or any part of the Collateral, or any other act except a release or discharge of the secured interest upon the full payment of the obligations secured by this agreement including charges, expenses, fees, costs and interest.

    g. Any failure by the Secured Party to exercise any right set forth in this Agreement shall not constitute a waiver thereof. Nothing in this Agreement or in the obligations secured by it shall preclude any other remedy by action or otherwise for the enforcement of this Agreement or the payment in full of the obligations secured by it.

[THE REMAINDER OF THIS PAGE IS PURPOSELY LEFT BLANK]

**"Pharmacy"**

**Pharmacy Matters (Iowa City) and (North Liberty)**

By: _Michael A Stein_
Printed Name: _Michael F. Stein_
Its: _Managing Member_

The foregoing was ( ) Sworn to and Subscribed **OR** ( ) Acknowledged Before me this _11th_ Day of _August_, 200_8_, by _Mike Stein_, as _Owner_ of _Pharmacy Matter_ who is ( ✓ ) personally known to me **OR** ( ) who produced _____ as identification.

_Sheri Castle_
Notary Public

Commission Expires: _2-17-10_

> **SHERI K CASTLE**
> NOTARIAL SEAL
> IOWA
> Commission Number 163979
> My Commission Expires
> _2-17-10_

**"Secured Party":**

**FACTOR HEALTH MANAGEMENT, LLC**

By: _Steven A. Schneider_
Printed Name: _Steven A. Schneider_
Its: _CFO_

The foregoing was ( ) Sworn to and Subscribed **OR** (X) Acknowledged Before me this _11th_ Day of _August_, 200_8_, by _STEVE SCHNEIDER_ as _CFO_ of Factor Health Management, LLC, who is (✓) personally known to me **OR** ( ) who produced _____ as identification.

Notary Public

Commission Expires: _04/18/2009_



> Notary Public State of Florida
> Ferial Hassan
> My Commission DD420099
> Expires 04/18/2009

## NON-DISCLOSURE AGREEMENT

This Non-Disclosure Agreement is made as of this 1st day of October, 2008, by and between Pharmacy Matters, 230 Scott Court, Suite 238, Iowa City, IA, 52245 ("Pharmacy Matters") on behalf of itself and its subsidiaries and affiliates; and HFC Associates, with its principal place of business at 551 NW 77 Street, #114, Boca Raton, FL 33487 (the "Company") on behalf of itself and its subsidiaries and affiliates.

In consideration of the mutual covenants and agreements contained herein, the parties hereby agree as follows:

1.      Pharmacy Matters has or will disclose confidential and proprietary business information to the Company.

All such information and all analyses, compilations, data, studies or other documents prepared by Pharmacy Matters or Pharmacy Matters' representatives or by the Company or the Company's representatives containing or based, in whole or in part, upon any such information shall be deemed confidential ("the Confidential Information"). The Confidential Information may be disclosed to the Company orally, in writing or via electronic media.

2.      The Confidential Information is being disclosed to the Company and/or its directors, officers, employees, agents or representatives, including, without limitation, the Company's attorneys, accountants, consultants and financial advisors (collectively, the "Company's Representatives") so that the Company may evaluate a possible transaction (the "Proposed Transaction").

3.      The Company shall take all reasonable efforts to keep in confidence and not to disclose to any third party (other than contractors or consultants who agree in writing to be bound by the terms of this agreement) the Confidential Information. The Company will be deemed to have met its obligations under this Agreement if it uses the same degree of care to avoid disclosure of the Confidential Information as it uses with its own similar information that it does not wish to disclose, provided such degree of care is reasonable.

4.      The requirement of confidential treatment shall not apply to any information that:

      a.      is already in the possession of the Company or any of its subsidiaries without any obligation of confidence;

      b.      is or was independently developed by the Company or any its subsidiaries (but not if such development is based upon Confidential Information);

      c.      is or becomes publicly available without breach of this Agreement and/or any other non-disclosure agreement entered into by Pharmacy Matters;

d.  is received by the Company from a third party the Company reasonably believes has the legal right to disclose such information, but if at any later time the Company is informed that such third party was not authorized to disclose such information, such information shall still retain its confidential treatment;

e.  is released for disclosure with Pharmacy Matters' written consent;

5.  The term of this agreement shall be two (2) years, and the Company's obligations as to confidence shall terminate at the earlier of two (2) years from the date of this Agreement or, sooner if such Confidential Information loses its confidential treatment under Paragraph 4 of this Agreement. It shall not be a violation of this Agreement for the Company to disclose the Confidential Information if it is required to make such disclosure in a judicial or administrative proceeding after all reasonable legal remedies for maintaining such information in confidence have been exhausted. In the event that the Company is required to disclose Confidential Information in a judicial or administrative proceeding, or it is likely that the Company may be required to make such a disclosure, the Company will provide Pharmacy Matters with prompt written notice thereof so that Pharmacy Matters may have adequate opportunity to seek a protective order or other appropriate remedy. In the event that such protective order or other remedy is not obtained, the Company will cause only the portion of the Confidential Information to be furnished which is legally required to be furnished and the Company will exercise its best efforts to obtain reliable assurance that confidential treatment will be accorded the Confidential Information so furnished.

6.  Although the Company understands that Pharmacy Matters will endeavor to furnish to the Company Confidential Information which Pharmacy Matters believes is reliable and relevant for the purpose of the Company's consideration of the Proposed Transaction, the Company acknowledges that neither Pharmacy Matters nor any of its representatives shall have any liability to the Company or to any of its representatives as a result of the use of the Confidential Information by the Company or its representative. It is further being understood that only those particular representations and warranties which may be made by Pharmacy Matters or its subsidiaries or affiliates in a definitive agreement, when, as and if such a definitive agreement is executed, and subject to such limitations and restrictions as may be specified in such definitive agreement, shall have any legal effect.

7.  Neither the Company nor Pharmacy Matters shall be obligated to enter into any business transaction with the other or refrain from doing business with others provided the parties hereto do not use each other's confidential or proprietary information.

8.  Only a formal written agreement constituting a transaction shall be binding upon the parties hereto except as to the rights and obligations under this Agreement.

9.  This Agreement shall be interpreted in accordance with the laws of the State of Iowa. Any proceeding brought to enforce this agreement shall be brought in the Supreme Court of the State of Iowa.

2

10. This Agreement shall not be assigned by either party without the express written consent of the other party.

11. No agency, partnership, joint venture or other joint relationship is created by this Agreement. This Agreement does not constitute or imply a license to use the Confidential Information, nor does it constitute any offer to purchase, license or lease by the Company.

12. Notices to the parties shall be directed to the address given on the first page of this Agreement.

13. Upon the request of Pharmacy Matters, the Company shall surrender to Pharmacy Matters (or in the case of computerized data destroy such data) all Confidential Information, including but not limited to, all memoranda, notes, records, drawings, manuals, abstracts, excerpts or other documents or materials (and all copies of same, including "copies" that have been converted to computerized media in the form of an image, data compilation, raw data, word processing files or other files, either manually or by image capture) pertaining to or including the Confidential Information. Upon the return of such materials, the Company agrees to certify, in a sworn writing, that all of the foregoing material have been surrendered to Pharmacy Matters, or in the case of computerized data, destroyed.

14. The parties hereby agree that this Agreement, the disclosures contemplated herein, and the existence of the Proposed Transaction shall be kept confidential and shall not be revealed to or discussed with any third-parties without mutual written approval of both parties hereto.

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed by their respective duly authorized representative.

**PHARMACY MATTERS**                    **HFC ASSOCIATES**

By: _Micha P. H. Sto_                    By: _____

3

W-2153